IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JERRY HARROLD,

        Plaintiff,

vs.                                        CASE NO. 1:10-cv-247-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/

# O R D E R

Plaintiff appeals from a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for a period of disability, disability insurance benefits, and supplemental security income.  (Doc. 1.)  The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 14 and 15.)  The parties consented to the exercise of jurisdiction by a United States Magistrate Judge, and the case has been referred to the undersigned pursuant to 28 U.S.C § 636(c).  (Docs. 12, 13.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff's applications alleged a disability onset date of February 7, 2008, due to stress, mental conditions, and inability to concentrate. R. 64-65, 116-21, 136.  Plaintiff's applications were denied initially and upon reconsideration. Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested

a hearing before an Administrative Law Judge ("ALJ").  On March 8, 2010, the ALJ

conducted Plaintiff's administrative hearing.  R. 34-63.   On April 6, 2010, the ALJ

issued a decision unfavorable to Plaintiff. R. 14-27.  Plaintiff timely filed a request for

review with the Appeals Council, which denied his request.  On December 15, 2010,

Plaintiff filed the instant appeal to this Court.  Doc. 1.

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

---

[1] <u>See</u> 42 U.S.C. § 405(g).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); <i>accord,</i> <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] <u>Foote</u>, 67 F.3d at 1560; <i>accord,</i> <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

The relevant portions of the administrative record may be summarized as follows.  In 2006 Plaintiff was committed to the North Texas State Hospital (NTSH) following his indictment for assault.  Plaintiff had been drinking heavily and hit his uncle in the head with a cordless drill during an altercation.  The court ordered a competency examination, and Dr. Berle Childers felt that Plaintiff had a delusional disorder with paranoid features that compromised his ability to communicate with his lawyer.  The NTSH notes state that the psychological profile used by Dr. Childers reflected "one score elevation that was considered in the pathological range on the scale.  However, there was no other indication of psychiatric illness or conditions."  R. 213-72.   The

---

[18] Walker at 1003.

[19] Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

NTSH notes further reflect that Plaintiff's "[m]ental status exam was unremarkable for flagrant/overt Axis I symptomatology.  He denied hallucinations of either an auditory or visual nature.  He denied neurovegetative symptoms consistent with mania or depression.  He denied homicidal and/or suicidal ideation.  He did seem preoccupied at times with issues of race and homosexuality . . . . At times these beliefs seem delusional.  At other times, he merely seems bigoted."  *Id*. at 218.   Plaintiff was neat, clean, cooperative, and his behavior was normal.  His thought process was organized, goal-directed, logical, and circumstantial; he was oriented to time, person, place, and situation; his judgment and insight were fair; he had average intellectual functioning; memory was grossly intact; and he was able to concentrate on, and pay attention to, given tasks within an interview setting.  *Id*. at 222-26, 238.  The evaluator concluded that Plaintiff should "[e]nter into competency training milieu as soon as clinically feasible . . . [n]o medications at this time but will continue to monitor for signs of Axis I illness that might respond to medications."

Plaintiff was discharged from NTSH on July 25, 2006, the court-mandated discharge date, but because NTSH staff concluded he needed medication that could not be provided before the discharge date he was re-admitted.  At intake, Plaintiff stated that he had "no problems" and no hallucinations, but agreed to take psychiatric medication for the first time.  *Id*. at 243-72.  Plaintiff denied any history of psychiatric treatment, and admitted a history of polysubstance abuse.  Plaintiff was discharged October 26, 2006, as competent to stand trial.  Gail I. Johnson, M.D., diagnosed Plaintiff with schizoaffective disorder, noting that he was improved and had done "very well within his current treatment."  *Id*. at 264.

6

On November 30, 2007, Plaintiff sought treatment for anxiety and medication evaluation through Urgent Care Gainesville.  Although the notes initially disclosed auditory hallucinations, during a psychiatric consult Plaintiff denied auditory or visual hallucinations.  A mental status examination showed that Plaintiff was pleasant, cooperative, had good eye contact, his mood was, in his words, "not too bad", his affect was anxious.  Plaintiff was assessed with reactive depression with anxiety features, history of nicotine dependence, and polysubstance abuse (alcohol, cocaine, and crystal meth).  He was prescribed anti-anxiety medication and advised to follow up with the Gainesville Mental Health Clinic.   *Id*. at 484-93.

Plaintiff presented to the emergency department on February 8, 2008, requesting a refill of anxiety medication.  The notes reflect that Plaintiff had taken the medication for 14 days following his 11/30/07 visit, and had missed an appointment with the mental health clinic on 12/7/07.  Plaintiff reported additional stress due to having lost his job two days previously and that he was considering applying for disability benefits.  He reported occasionally hearing voices.  Plaintiff was given a duplicate of his previous prescription and scheduled for follow-up with the mental health clinic.  *Id*. at 471.

On February 21, 2008, Plaintiff reported hallucinations, delusions, and difficulty managing anger. He reported that he had lost his job the week before for fighting.  He was cooperative, with no visible hallucinatory behavior, normal affect, and appropriate speech, with some slight psychomotor agitation.  A depression screen suggested "mild depression."  The physician noted that Plaintiff's symptoms seemed consistent with an Axis I psychotic disorder, with "substance abuse conceivably present or causative."  He

7

prescribed anti-psychotic medication and Plaintiff was scheduled to attend the mental health clinic.  *Id*. at 459-67.

Plaintiff underwent a psychiatric assessment at the VA Mental Health Clinic on February 25, 2008.  He was not on medication.  Plaintiff described depressive episodes beginning at age 35, manic episodes beginning at age 25, auditory hallucinations beginning at age 13, visual hallucinations, thought insertion, paranoid delusions, anxiety, and obsessive compulsive disorder (OCD) behaviors including washing his hands 15 times per day and counting money, steps, and other items.  Joanne T. Donnell, ARNP, diagnosed Plaintiff with schizoaffective disorder, chronic, bipolar type; OCD; and polysubstance abuse in sustained partial remission.  She recommended biweekly psychotherapy.  *Id*. at 453-58.

On March 17, 2008, Tammy Hendrix, M.S.W., conducted an initial case management visit for the VA's Mental Health Integrated Supportive Action program (MISA) while Plaintiff was confined in jail on a domestic battery charge.  Plaintiff displayed manic affect and disorganized cognitive status, but Ms. Hendrix noted that, "once stabilized," Plaintiff could be appropriate for the VA Supported Employment Program (SEP).   Ms. Hendrix assessed: "Polysubstance [disorder] (reports approx. 1 month sober), Newly diagnosed psychotic [disorder not otherwise specified] with no consistent medication regimen.  Minimal [auditory hallucinations], unsure as to [visual hallucinations].  Manic affect, but overall pleasant mood and relatively coherent thought process.  Early abstinence, secondary to time in jail and absence of funds."  She scheduled Plaintiff for MISA group appointments beginning in March 2008.  *Id*. at 446-48.

Progress notes by a social work intern who visited Plaintiff in jail on April 8, 2008,
reflect that while Plaintiff's appearance was disheveled, he was alert and oriented x4,
made good eye contact, his thought process was logical and coherent, and he exhibited
no overt delusional thinking.  His affect was normal with regular range and his mood
was anxious.  The social worker assessed: "Early sobriety as a result of vet being
incarcerated.  Vet reports taking his meds and is currently experiencing minimal
paranoia."  R. 434-35.

On April 18, 2008, Plaintiff reported "no chronic medical problems that
interfere[d] with his life," that he was not taking any medication regularly, and he had no
medical problems in the last 30 days.  *Id*. at 421. On April 21, 2008, Ms. Hendrix
assessed polysubstance abuse, newly-diagnosed psychotic disorder NOS with no
consistent medication regimen, minimal auditory hallucinations, and manic affect.  *Id*. at
420.

In May 2008, Plaintiff was released from jail and transported to the Gainesville
VA Medical Center for appointments and medication, followed by transport and
placement in Serenity House, Daytona, under VA contract.  Dr. James C. Byrd
provisionally diagnosed bipolar disorder, but wanted to rule out impulse control
disorder, and substance-induced mood disorder.  Plaintiff reported having worked for a
while at Hunter Marine, but his work history became erratic and he was banned from
the day labor pool.  Plaintiff stated he had experienced auditory hallucinations in the
past, although it was unclear whether such hallucinations were related to substance
abuse.  Plaintiff was alert and oriented x4, mildly guarded but conversational and
cooperative.  Plaintiff was further assessed as  "[g]enerally pleasant, fairly full,

congruent affect, speech is spontaneous, logical, relevant, and goal-directed.  No

delusions.  No A/V hallucinations.  Insight and judgment are limited but adequate[.]"  *Id*.

at 407-09.

On June 10, 2008, Plaintiff was seen in the outpatient clinic complaining of pain

in his right leg (knee and hip) that had recently become more intense.  Plaintiff reported

that he fractured the leg in 1981 in a car crash.  Radiographs reflected minimal

degenerative changes in the right hip and trochanter bursal calcifications.  Plaintiff was

advised to take anti-inflammatories and was given knee support.  *Id.*  at 348, 371, 375-

76.

On June 24, 2008, psychiatrist Celia Rodriguez, M.D., assessed psychotic

disorder, not otherwise specified, alcohol abuse in remission, and osteoarthritis.   She

noted Plaintiff reported auditory hallucinations.  *Id*. at 349-50.

On July 17, 2008, during an interview with Anne Catherine Opuda, ARNP,

Plaintiff's MISA program case manager, Plaintiff denied any substance abuse problem,

stating that he did have one in the past, but was recovered and now his primarily

problem with "getting along with people."  Plaintiff reported auditory hallucinations but

did not appear to be responding to "internal stimuli."  He stated that he needed to find a

job now that he was taking psychiatric medication. That same day, Plaintiff and Serenity

House staff requested an additional 30 days of treatment, and Plaintiff's stay was

extended to August 19, 2008.  *Id*. at 335-36.

Plaintiff was discharged from Serenity House on August 19, 2008, and

transferred to Dogwood, a VA transitional housing facility.   In a letter dated September

10

2, 2008, Ms. Opuda noted that Plaintiff was participating in MISA daily and was under court order to participate in treatment. *Id*. at 308, 318-19.

A progress note on September 3, 2008 indicated Plaintiff had "psychosis NOS with bipolar features" and cited goals of stabilizing Plaintiff's psychotic and mood symptoms by March 2009, primarily with medication. The progress note indicated that Plaintiff would be referred to the VA supported employment program in order to meet his objective of getting a job by March 2009. *Id*. at 534-35.

Plaintiff participated in outdoor MISA group activities in August and September 2008, including one-mile nature walks along Hogtown Creek, and hikes at Paynes Prairie State Park and a hike into the sinkhole at the Devil's Millhopper State Park. *Id*. at 502, 519, 524.  Plaintiff's disability claim for an alleged service connected right hip injury was denied because his hip injury preceded his military service. *Id*. at 599. Plaintiff reported right knee pain to Janet M. Caruso, M.D. on September 22, 2008, and she noted no deformity, effusion, warmth, or erythema, negative drawer test, and no joint space widening, but crepitus with motion. *Id*. at 508-10.

On September 29, 2008, Plaintiff reported to a MISA psychiatrist that he was doing well and denied any mania or depression. Plaintiff stated that when he starts thinking too fast, he can calm himself down.  Plaintiff expressed that he attended MISA group activities daily, and enjoyed the program. *Id*. at 502-03.

Plaintiff's MISA group counseling progress notes reflect that he was consistently alert, appropriate, and engaged in the program, which focused on overcoming addiction. *See e.g. id.* at 309, 315-87, 519, 715, 722.

11

X-rays of Plaintiff's right knee on October 17, 2008, showed hyperostosis, but no joint effusion, arthritis, or other focal bony abnormality. *Id.* at 738.   A cane was ordered for Plaintiff. *Id.* at 561. Plaintiff underwent an orthopedic consultation with Scott L. Myers, M.D., on November 14, 2008; treatment notes reflect that Plaintiff had a "progressive catching and locking sensation in his right knee" with mild antalgic gait and full range of motion.  X-rays revealed small osteophytes in the right knee, but no significant sclerosis and no cystic changes. The physician noted a possible medial meniscus tear and ordered an MRI. The MRI indicated hyperostosis, intact ligaments, and no meniscal tear. *Id.* at 641, 736-37.

On November 18, 2008, Dr. Byrd noted Plaintiff was doing fairly well, with stable moods. *Id.* at 637-40. On November 26, 2008, Ms. Opuda noted that Plaintiff's diagnosed mental disorders were stable, he was getting along with roommates, interacting socially with other veterans, and reported his mood was good. *Id.* at 626-27. A progress noted dated December 1, 2008 indicated that Plaintiff was not interested in the VA supported employment (SE) program but was interested in the Transitional Work Experience (TWE) program and Ms. Opuda made a consult. *Id.* at 618.  On December 10 and 31, 2008, Ms. Opuda noted that Plaintiff's polysubstance abuse was in "sustained remission," he was getting along with his roommates and interacting socially with other vets, and he was engaging helpfully in chores.  Plantiff's mental status was assessed as: Alert, oriented x4, able to articulate feelings, described mood as "good," constricted affect, thought process coherent and responses relevant to topic, appropriate eye contact without pressured speech, adequate attention and working

memory, no suicidal/homicidal ideation, no auditory/visual hallucinations, no evidence of delusional thinking.  *Id*. at 596, 608-09.

The progress notes reflect that in 2009, Ms. Opuda consistently noted a diagnosis of "stable" bipolar disorder with psychotic features versus impulse control disorder, although there was some exacerbation of symptoms in late 2009 including reported auditory hallucinations and irritability.  *See id*. at  596, 647-48, 653, 663, 672, 678, 721, 725, 728, 863, 890, 902, 929, 977, 997, 1018.  Plaintiff was enrolled in TWE on February 4, 2009, and performed average or above average work as a groundskeeper.  His site supervisor indicated that Plaintiff was "an asset . . . [v]ery dependable in all duties performed." However, Plaintiff was terminated from the TWE program on March 26, 2009, after testing positive for cocaine.  *Id*. at 709.

Plaintiff re-entered residential substance abuse treatment at Serenity House on July 17, 2009, and was discharged 60 days later, having met goals of sobriety and mental stability.  *Id*. *at* 763-77.  Serenity House notes at discharge indicate that "Jerry has the ability to gain employment and earn income.  Jerry has a strong desire to seek and obtain employment."  *Id*. at 799.

Plaintiff returned to the VA's Dogwood transitional housing in September 2009, and then moved to an apartment at Bailey Village, another VA transitional housing facility, in October 2009.  Plaintiff reported that he occasionally looked for job openings and did "side jobs" helping friends and doing minor repairs for extra money.  Plaintiff was given information about the VA's supported employment program because he met the diagnostic criteria, with a goal of competitive employment in the community, but expressed that he would like to return to the TWE to complete that program.   Progress

notes indicate that Plaintiff could be "re-referred in the future as appropriate once veteran is motivated to seek employment in the community." *Id*. at 894-96.

As of December 2009, Plaintiff had not begun an active job search, but remained involved in MISA activities, including actively participating in an exercise group four days per week and one-mile walks.  He reported a goal of securing employment in the community, and specifically expressed interest in securing work in either a factory or warehouse setting.  *Id*. at 972-73, 1046.

Plaintiff sought treatment with Dr. Byrd in December 2009 after reporting increased auditory hallucinations, but reported improvement a few days later with medication adjustment.  *Id*. at 964-66.  In January 2010, Plaintiff showed no evidence of paranoia or excessive guardedness, he had good emotional control, he was friendly, conversational and cooperative; his affect was fairly full and congruent, and he had no delusions or auditory/visual hallucinations.   Dr. Byrd noted a diagnosis of bipolar disorder with psychotic features.  *Id*. at 1049-53.

Plaintiff was 46 years old at the time of the administrative hearing in March 2010. He testified that he completed school through twelfth grade, and served in the Army for three years.  Plaintiff drove a tractor-trailer in the Army.  At the time of the hearing, Plaintiff lived in a VA apartment with a roommate.  Plaintiff reported a dual diagnosis of mental health issues and substance abuse.  His VA housing is a sober-living facility, and he continued to participate in the MISA program.  Plaintiff testified that he had not used illegal drugs since 2005 and had been sober for almost a year.  Plaintiff testified that he suffers from shakes, and that he has hallucinations once or twice every two or three months, lasting four or five days.  When he is not attending meetings in the MISA

program, Plaintiff watches TV, shops for food, and prepares his own meals.  Plaintiff

uses a cane due to a problem with his right knee locking up, and stated that he was

being evaluated for surgery.  Plaintiff testified that he could sit for no more than two

hours at a time due to his knee and mental issues, that he could stand 45 minutes to an

hour, and that he could walk a couple of blocks without his cane before his leg would

hurt.  Plaintiff testified that he could lift 25-30 pounds while sitting.

With respect to the reported diagnosis of bipolar disorder, Plaintiff testified that

he cycles up and down often, and that he has difficulty sleeping when he is up.  When

he is down, he does not see his friends and sometimes goes without eating.  Plaintiff

testified that MISA had been big help with his mental health problems, and that he

attends meetings five days a week from 9:00 a.m. to 2:00 p.m.  Plaintiff usually donates

plasma twice a week for extra money.  R. 34-55.

The ALJ asked a vocational expert (VE) to consider a hypothetical individual of

Plaintiff's age, education, and work experience, with an RFC for a restricted range of

light work, including simple work-related tasks and some moderately complex tasks,

and only superficial contact with co-workers and the public.   The VE testified that such

an individual could work as a data examination clerk (850 jobs in the region and

220,000 jobs in the nation), clerical worker (750 jobs in the region and 185,000 jobs in

the nation), or cashier (800 jobs in the region, 130,000 jobs in the nation).  *Id*. at 58-59.

## IV. <u>ALJ'S FINDINGS</u>

The ALJ determined that Plaintiff met the earnings requirements of the Act

through August 30, 2008.  In his review of Plaintiff's testimony and the medical records,

the ALJ determined that Plaintiff suffered from the severe impairments of bipolar

disorder (provisional), and mechanical and musculoskeletal problems affecting the use of his right leg.  The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equalled the listings.  The ALJ concluded that because Plaintiff's mental impairments, as documented in the record, do not reflect at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation, the Paragraph B criteria were not satisfied under section 12.03 of the listings.  The ALJ also concluded that the Paragraph C criteria (inability to function outside of a highly supported living situation) were not satisfied because there was no evidence of such "florid" psychotic episodes or mental disorder which reflected an inability to function outside of such a living situation, apart from Plaintiff's alcohol dependence.  The ALJ observed that when participating in drinking or drug abuse, Plaintiff exhibits moderate restrictions in daily activities, social functioning, and concentration, persistence, or pace.  Without substance abuse, Plaintiff exhibits no more than mild restrictions in activities of daily living, and moderate difficulties in social functioning and in concentration, persistence, or pace.

In making these findings, the ALJ noted that he had the opportunity to personally assess Plaintiff's statements regarding his symptomology at the hearing.  The ALJ noted that Plaintiff's testimony that he had not used drugs since 2005 was at odds with his other statements in the record admitting more recent drug use, and with his dismissal from the TWE in 2009 due to a positive drug screen.  The ALJ noted that Plaintiff had made inconsistent statements about his social/family history with respect to whether he was married and how many children he had.

The ALJ reviewed Plaintiff's provisional diagnosis of bipolar disorder and

16

diagnosis of psychotic disorder NOS, but also noted that the course of Plaintiff's mental health treatment at the VA was focused on substance abuse/dual recovery, relapse prevention, and therapeutic social activities, and that most of Plaintiff's treatment at the VA had been delivered by social workers and health technicians.  The ALJ noted Plaintiff's active participation in MISA's programs and activities, including completing group exercise walks over varied terrain with no reported limitation or restriction due to medical or behavioral/mental problems or deficits.  The ALJ concluded that the "contact notes of the dual recovery program do not document any significant limitation due to 'signs' or 'symptoms' of 'schizophrenia' or of 'bipolar' that hindered the claimant from being active, participatory, involved, communicative, relational, oriented, alert and aware notwithstanding assessments of 'substance abuse in sustained remission' and 'bipolar disorder with psychotic features.'"

The ALJ determined that:

Other than the polysubstance abuse, the claimant's primary challenge has been assessed as reflecting inadequate social skills and angry/aggressive behavior.  However, there is no demonstrated medically imposed disorder, behavior, or limitation which would significantly interfere with the claimant's ability for self-supportive work activity within his vocational capacity on [a] regular, reliable, responsible, compliant, cooperative, and continuing basis, given interest or motivation on the part of the claimant. Capacity, from a mental and behavioral standpoint, was demonstrated by the VA contacts.  The whole of the evidence is in keeping with the absence of any clear cut diagnostic label and with provisional diagnosis, other than the polysubstance abuse.

Based on the physical and mental limitations documented in the record, the ALJ determined that Plaintiff had the RFC for a restricted range of sedentary work.  The mental restrictions accepted by the ALJ were simple work related tasks and some moderately complex tasks involving superficial contact with co-workers, supervisors, or

the public.

In evaluating Plaintiff's complaints regarding his symptoms, the ALJ noted that Plaintiff had complained of knee pain and testified that he had to sit with the leg extended, but there was no documentation in the record of an impairment that would reasonably be expected to produce debilitating pain that would prevent Plaintiff from performing work within his vocational capacity on a regular basis.

The ALJ concluded that Plaintiff's knee problem precluded his past relevant work in various labor jobs and as a chemical factory worker.  Based on his assessment of Plaintiff's RFC for a restricted range of sedentary work, and Plaintiff's age, education, and work experience, the medical-vocational grids directed a finding that Plaintiff is not disabled.  The VE's testimony established that Plaintiff could perform a significant number of jobs in the economy given interest or motivation on the part of Plaintiff.

## V.  DISCUSSION

Plaintiff makes three arguments in opposition to the Commissioner's decision. First, Plaintiff contends that the ALJ failed to properly assess Plaintiff's mental RFC. Plaintiff contends that the ALJ minimized Plaintiff's mental health problems because the Plaintiff also suffers from substance abuse problems.  As support for this argument, Plaintiff points to the 2006 records of the NTSH, where Plaintiff was committed pursuant to court order following his indictment on assault charges.  Plaintiff alleges that these records are more significant than Plaintiff's VA records because Plaintiff did not have access to drug and alcohol while he was committed to NTSH.  Plaintiff contends that the NTSH records establish that Plaintiff is seriously psychotic.

In response, the Commissioner points out that the NTSH records pre-date

Plaintiff's alleged date of disability onset, February 7, 2008.  As the Commissioner

notes, the record reflects that Plaintiff successfully worked as a full-time laborer after

his discharge from NTSH, from December 6, 2006, to August 25, 2007.  *See* R. 169-70,

204.  The Commissioner contends that in any event the NTSH records do not reflect

greater functional limitations than those found by the ALJ, because Plaintiff's

symptoms, if he in fact had a psychiatric illness, improved and he was stable and

competent upon discharge.

    Notwithstanding that the NTSH records pre-date Plaintiff's disability onset date,

this Court must look at the entire record, and all of the relevant evidence, as it applies

the substantial evidence standard. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th

Cir.1983).  In this case, it is clear that the ALJ considered the NTSH records, noting

Plaintiff's April 2006 arrest for aggravated assault and resulting commitment.  *See* R.

18.  The ALJ observed that Plaintiff was not found to have "an exculpable mental or

other impairment or disorder, mental disease, or mental defect, and he was competent

to go to trial."  *Id*.[22]

    The NTSH records are ambiguous as to whether Plaintiff's problems stemmed

from a mental disorder or from a personality disorder or objectionable personable

beliefs.  In any event, the extensive, contemporaneous records from the VA, as

summarized above, provide ample support for the ALJ's conclusion that Plaintiff is not

disabled on account of his mental impairments, singly or in combination with his

---

[22] The ALJ made a factual error by stating that after the 2006 Texas commitment Plaintiff was transitioned into intensive case management at Serenity House and then into VA care.  The Serenity House and VA placements were made following Plaintiff's release from jail in Florida in 2008.  This misstatement was harmless because it had no bearing on the ALJ's assessment of Plaintiff's impairments.

19

physical impairments.

Plaintiff next contends that the ALJ erred at Step Four in determining Plaintiff's mental RFC.  Plaintiff argues that the ALJ's conclusions about what the Plaintiff can or cannot do, given his severe mental health impairments, are arbitrary because the ALJ failed to obtain a mental RFC by a state agency or consulting or treating psychologist or psychiatrist.  This argument is without merit.  As the Commissioner points out, the record reflects that opinions of state agency consulting physicians were not obtained because Plaintiff and his counsel at the administrative level failed to cooperate with the consultants, and therefore there was insufficient evidence to complete the assessments.  R. 273-86, 293-307.  Inasmuch as it is Plaintiff's burden to produce evidence of his RFC, the ALJ did not err in determining Plaintiff's RFC on the basis of the record evidence.

For his final argument, Plaintiff contends that the ALJ's hypothetical to the VE did not include all of Plaintiff's limitations because it did not include most of the 20 areas covered on the Commissioner's Mental RFC Assessment Form.  As noted, no assessment form was completed because Plaintiff did not cooperate in an assessment. In assessing Plaintiff's RFC on the basis of the record evidence, the ALJ addressed each of the four broad functional areas from the "B Criteria" of the Psychiatric Review Technique Form, with and without consideration of Plaintiff's substance abuse.  R. 23; *See* 20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).  Considering Plaintiff's substance abuse, the ALJ determined he had moderate limitations with respect to activities of daily living, moderate limitations in social functioning, and moderate limitations in concentration, persistence, and pace.  Without the substance abuse, the ALJ

20

determined that Plaintiff had only mild limitations with respect to activities of daily living and moderate limitations in social functioning and concentration, persistence, and pace. In determining the extent of Plaintiff's functional limitations, the ALJ determined that Plaintiff's subjective complaints were not fully credible – a finding that Plaintiff does not contest.  The moderate mental functional limitations found by the ALJ are supported by substantial evidence in the extensive records documenting Plaintiff's treatment, and such limitations were adequately incorporated into the hypothetical posed to the VE, which limited requirements to simple work related tasks and some moderately complex tasks involving superficial contact with co-workers, supervisors, or the public.

Accordingly, the Court concludes that the ALJ's decision is fully supported by the substantial evidence of record. The ALJ did not err in evaluating the Plaintiff's mental residual functional capacity and properly determined Plaintiff's mental impairment in evaluating Plaintiff's RFC. The hypothetical posed to the VE included all of the limitations included in the RFC and therefore the VE's opinion that there was other work in the national economy existing in significant numbers that Plaintiff could perform constituted substantial evidence upon which the ALJ properly could rely in determining that Plaintiff was not disabled.

## VI.  CONCLUSION

In view of the foregoing, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter final judgment and close the file.

**DONE AND ORDERED** in Gainesville, Florida, this 11th day of January 2011.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge